The next matter is case number 15-1945, Tudor Perini v. Banc of America Securities. May it please the Court, George Carpinello, Boies Shill, and Flexner for the plaintiff appellant Tudor Perini with me, my partner Adam Shaw, your honors. I wish to reserve three minutes for rebuttal, if I may. You may. Thank you, your honor. There are several factors that make this case unique from any other securities case and unique from any of the cases that my adversary cites. First, this is a case of one-on-one relationship where the broker made a specific promise to his client that it would provide customized portfolio advice. It would give tailored advice to the client and would identify the risks and rewards of each investment. This is not a case where someone is executing trades. In fact, the broker specifically said, we will do more than just execute trades. We will be your advisor. That clearly created, that alone, created a duty to disclose material facts. Appellee's brief said that you didn't raise that with the district court. Well, appellee's brief says that we waived the issue, but they didn't raise it below. They raised, in their motion for summary judgment, they raised seven separate grounds and did not argue that we had no duty to disclose. We responded to all seven arguments. There are two sentences in their brief, two sentences, where they say they had no duty to disclose the waivers of the maximum rates, and we responded to that specifically. And we specifically said, you did have a duty to disclose, for the second reason I'm going to mention, which is you made specific recommendations, and under Passos, Massachusetts law, you have a duty to disclose by making recommendations. But their argument that they had no duty to disclose was not raised until the reply brief. They're the ones that waived the issue, because they didn't raise it until the reply brief. Normally, what would happen if someone raises a new issue for seeking summary judgment in the reply brief below, the party opposing summary judgment would move either to strike the reply brief or for sure reply or supplementation of the record. As I read the record here, you didn't do any of that. We did not do that, Your Honor. We did respond in their cross motions for summary judgment. In their answer to our cross motion, they mentioned they did not make a full argument about duty to disclose, which we did respond to in our reply. But is that in your motion for summary judgment? Yeah, we moved for summary judgment. No, is that argument in your motion, this duty, is that argument in your motion for summary judgment? In our reply to their argument, we didn't show a duty. In your motion. That's the question. Our motion argued that there were material facts that they did not disclose, and we detailed in great detail the material facts. So the answer to Judge Thompson's question is no. We did not make a specific argument in our motion for summary judgment that they had reached a duty to disclose. So if that's an affirmative party or claim, putting to one side whatever they said, how would you have not put it forward below in the court, in the court below? In your motion. When you get to summary judgment and they're moving and you're moving, it would seem rather odd that a theory that goes to the fundamental nature of the relationship between the parties, as I hear it, you're saying this is not just a typical non-discretionary investment account. Correct. You're saying this is kind of almost an advisory account. That argument we clearly did make. That argument we clearly did make. We did argue specifically that this was a one-on-one relationship, that Bank of America had a 20-year relationship, that Bank of America had actually set our standards for investing, that Bank of America then recommended that we move to auction rate securities, and that Wallace McGrath made specific recommendations to Sue Malachi to invest in auction rate securities. Those recommendations, in and of themselves, even leave aside the promise contained in their statement that they would give us investment advice, their recommendations of that one-on-one relationship, in and of itself, created a duty. And we did argue that below. We did argue that position below. And the Patsos case makes it very clear, along with literally a dozen other cases in state and federal courts, that when you make a recommendation with regard to specific investments, you have a duty to disclose all the material facts concerning that investment. My adversary does not cite a single case to the contrary. Not a single case. Because there is not a single case. When you make recommendations, you have a duty to disclose all the material facts. And we pointed out, I think, in every brief, our moving brief, our answering brief, on both motions, that Wallace McGrath had made specific recommendations to Sue Malachi, which she knew she would follow, and which she did follow. Let me ask you about that. Looking through the timeline, it looks like September 19 of 07 is the last date that we pointed to in your brief where BAS tells TPC something about ARSs, specifically they're a better investment. TPC buys and then sells. So it's in and out. Then the sales at issue appear to come later in January and February. Is there any communication, any representation, any implied recommendation between that September 19 date and the purchases in the winter? Or are you saying that recommendation just had a long shelf life? No. There were recommendations in January. Okay. What are you pointing to specifically? There were several emails that Wallace McGrath sent to Sue Malachi that said featured ARS. And there's no question that sending a specific recommendation for an investment and saying this is our featured ARS, which, by the way, Wallace McGrath knew Sue Malachi would rely on because he had a history of Wallace McGrath sending particular recommendations to Sue Malachi and Sue Malachi buying them, acting upon them. And they continued. Wallace McGrath continued to do that in January when the market is at extremis. We're only days away from the collapse of the market on February 13. There are failures in the exact kind of student loan auction rate securities, SLARs, that Wallace McGrath has recommended to Sue Malachi. Wallace McGrath is sending you recommendations to buy auction rate securities at a point in time when internally Bank of America knew the market was going to collapse. There are literally dozens of emails that indicate that Bank of America was aware this market was on the verge of collapse and was going to collapse. And, incidentally, we're dealing here primarily with a blue sky law claim. We don't have to prove reliance. We don't have to prove causation. And our less sophistication is legally irrelevant. So what do we have here? We have a senior executive saying to his traders, right to Wallace McGrath, don't be a hero. We come first. We need to make decisions based on our own interest. In November, the senior risk manager says we are one step away from illiquidity. Bank of America knew that Tutor Puini needed one thing, and that was liquidity. This was their client's cash. Tutor Puini's client's cash. This was cash they were getting to build projects they had put into conservative investments. They had always put them in very conservative money market investments. It was Wallace McGrath who urged Sue Malachi to take them out of those investments. She specifically made the representation that these are better for you than those money market funds. That was a lie. That was clearly false, even in September 2007, because we had 60 auction failures. 60 auction failures were just before Wallace McGrath says to Sue Malachi, guess what? Auction insecurities are a great investment. They clearly were not a good investment. They were a bad investment, especially for someone looking for liquidity. And internal emails acknowledge that. Which date are you talking about? In September of 2007. Okay. And all the purchases that are issued are in January and February of 2008? The purchases that are issued, Wallace McGrath urges Sue Malachi to purchase throughout the fall of 2007. Tutor Puini liquidates their investments at the end of 2007. There's an internal Bank of America email that says, Will Tutor Puini come back in? Can we count on Tutor Puini coming back in? Wallace McGrath immediately, I think it was January 2nd, sends to Sue Malachi featured auction insecurities to invest in. She sends several of those. Sue Malachi reinvests. She goes from zero to $238 million in January. The market collapses on February 2nd. So it's the sending of that list of featured ARSs you would have us characterize as a recommendation to buy, which then, even if it's a non-discretionary account, you would say under Massachusetts law, triggers disclosure obligations. Yes. But you can't ignore the fact that this is a... There's a background. Yeah, there's tons of background. And all through the fall, she's urging her to buy while internally Bank of America is saying it's going to fail. And incidentally, not just that auction rate securities are going to fail, but these specific auction rate securities, student loan auction rate securities were particularly susceptible to failure because they had these variable rates, they had these max rate caps, which are going down while the bidding rates are going up. And we have internal emails where the risk managers say, We are one step away from no liquidity. We can't keep this market floating. The risk manager says to the brokers, Make sure that we do not hold any auction rate securities. While Bank of America, as their advisor, while making recommendations to their clients, says buy auction rate securities, at the same time, they are telling their internal traders, Get them off of books. This was a zero-sum game. If it ever was, it was in January. And the deal was, when the music stops, they should be holding it, not us. This is a company that promised tailored investment advice, that made specific recommendations, that preyed upon a 20-year relationship to urge this company to go out from their safety investments under investment policy that Bank of America had written, and went into auction rate securities at a very time they knew was on the verge of collapse. My client concedes that if this market was on the edge of collapse, the Grand Canyon analogy is correct. That is, you cannot, you don't get away with a boilerplate recommendation, that you say that there may be bumps in the road, where you know your client is a foot away from the Grand Canyon. We were a foot away, they knew it, they intentionally didn't tell us. In fact, U.S. Trust, a subsidiary, in January, while we're buying, sends out a directive to its managers, get your clients out of auction rate securities. What is the reaction of the division that handles my client's accounts? These people should be shot for telling their customers to get out of auction rate securities. Are they trying to put us out of business? That's a quote. And the reason they say that is because they knew that the market can only be sustained by getting people at 2 and 3 to continue to buy out of inventory. 95% of our buys in January are out of Bank of America's own inventory. Bank of America is not giving investment advice. Bank of America is using us as a taxi to dump their auction rate securities. All those facts are before the district court. Every single one of those facts were presented to the court in our survey of judge of motion. Not a single fact, not a single one of those facts is recited in the court's opinion. Not a single one. So what we're saying is that they had a duty to disclose. The boilerplate statements, oh, we could withdraw support. This isn't a case about whether, may I finish my sentence? Yes, please. This isn't a case about whether we didn't know they could withdraw support. This is a case about them not telling us about the state of the market that they knew and that they acted upon. Thank you. Could you just address their argument that there were external factors that were present and available to your client to understand the state of the market? Yes, I would. Thank you for the question. First of all, under the Blue Sky Law, we don't have to show that we could have gone out and found articles. They cite articles from the financial press which our client did not see. And, in fact, the auction market is a very open market. There's a curtain. It's not like the stock market. You don't know if auctions fail. You don't know who put in bids. You don't know how many people put in bids. You don't know whether Bank of America is putting a bid just below the max rate to prevent a failure, which they did all through this period of time. Bank of America knew that student loan auction rate securities had failed in January. They knew Lehman Brothers had failed AAA auction rate securities in January. That was not reported in the press. We did not know about it. And it was perfectly appropriate for Sue Milagy to rely on Lois McGrath when she had this long-term relationship to give her advice about what was happening in the market. And she didn't do that. She did more than that. She affirmed the record misrepresented with the nature of these auction rate securities. In September of 2007, when she said, these are good. These are better. Invest. It's an active market. All those representations were objectively false as early as September, and they were clearly false in January. She had a duty, having said all that, to tell Sue Milagy, at the very least in January, when she invested another $238 million, by the way, the situation had changed. You should look at this. She didn't. Thank you. Thank you, Your Honor. Your Honor, may I please the court, Jonathan Rosenberg on Melvin Ian Myers for the Bank of America defendants. With me at council table is my colleague, Andrew Bednark. Your Honors, the long line of circuit and district court decisions dismissing ARS cases in similar circumstances provides a blueprint for why this court should affirm Judge Gorton's summary judgment decision below. Based on virtually identical ARS disclosures, there are basically four overriding principles that the court can glean from those cases. First, no reasonable person could conclude that broker-dealers bidding was not keeping auctions afloat. And that's Judge Preska's decision in the Louisiana Pacific Gas case in the Southern District of New York. Second, alleged omissions about how often demand failed to meet supply in Slar's auctions do not state a claim. That's the Second Circuit in the Ashland case. Third, broker-dealers had no obligation to disclose concerns, internal concerns, about ARS auctions and the potential for auction failures. And that's the J.P. Morgan case in the Southern District of New York, Judge Bartofi's decision. Let me ask you about that. What about the contention that under Massachusetts law, when you send a list of specified, proposed, recommended, whatever you call it, investments to the account holder to buy, that that triggers an obligation to disclose material information concerning those recommended products? Your Honor, there's a reason that… The Second Circuit doesn't address that Massachusetts law issue. Your Honor, there's a reason that Perrini didn't make these duty arguments below and has waived them, and that's because they didn't get them anywhere. Perrini cites the Patso's case, the SJC case on a broker-dealers relationship. First of all, Perrini concedes in its brief at page 18, as it must, that there's no fiduciary relationship, and that admission swallows its argument that there was an equivalent relationship of trust and confidence. Secondly, Patso said that in a nondiscretionary account, as what you have here, there is no fiduciary-type relationship, unless the account representative is making decisions for the customer. And in this case, it was just the opposite. I'm trying to say if the account representative recommends the customer buy a particular thing. The limited duty, when there's a recommendation, and we agree that presenting auction rate securities as an investment option is an implicit recommendation, but the limited duty under Patso's is, A, to investigate the nature of the security, and second, to disclose the risks. And as the courts in ARS cases have said time and time again, the fulsome ARS disclosures that were made in this case, which emphasize the importance of broker-dealer bidding and auctions, and that the absence of that is the risk that came to pass in this case, that that satisfies your risk disclosure obligations. And the law in this circuit, Your Honor, under Hill v. Ghazani and its progeny, Boston Scientific and the Backman case, is that once you adequately disclose the risk, which a long line of cases have said these ARS disclosures do so, then you don't have an additional obligation to disclose when you think the risk might be heightened, to disclose degrees in the risk as you go along. And in this case, Your Honor, when a representation has been made when these products were first recommended, that there's a long, mature history of these ARSs, and that the market is such that it would be reasonable to rely upon those types of investments, when it gets to January, when the market is near collapse, why wouldn't that trigger a duty to further refine the degree of risk? First of all, Your Honor, to the extent Your Honor is referring to the May 2006 PowerPoint, there's no evidence that anyone at Perini actually read it. There's no connection between that PowerPoint presentation in May 2006 and the ultimate sales that are at issue in this case in January of 2008. And what Bank of America... Wasn't it a long, continuous relationship? Sure. An ongoing relationship with the recommendations continually being made to take a look at these products. Sure. And Bank of America fully disclosed the risks. The fact that there was a long relationship, which you would have in most situations involving a nondiscretionary account, doesn't impose any further obligations, particularly when you're talking about a situation where they point out snippets of information that in the grand scheme of things don't alter, don't significantly alter the total mix of information in any event. What risk that was at issue here, Your Honor, is the risk that Bank of America will withdraw its support. Suna Lachi, Perini's experienced treasurer, understood that that was the risk. If you look at her February 7, 2008 email, for example, she specifically says that the risk that I am watching, she doesn't say Bank of America and I are watching, but she says the risk that I am watching is that there will be a run on the bank, which will be a liquidity issue. And because of that, she says I need to diversify, I need to reduce my exposure to monolines, and I need to put more money in money market funds. You seem to be saying that in all situations of nondiscretionary accounts, even when you make a recommendation, as long as you disclose the nature of the risk, for example, any company could go bankrupt, that suffices even if at the moment you make that recommendation, you've got a crew back in your home office working on the anticipated bankruptcy proceeding that you anticipate is going to be filed in a couple of days. That seems of not much disclosure. That's not the case here for two reasons, Your Honor. But let me ask you, on that hypothetical I just gave, is that your position that simply saying any company could go bankrupt is enough? No, Your Honor. And what we have here is not generic risk disclosures. Generic risk disclosures would be securities entail risk. Well, auctions can fail. Well, auctions can fail. We could withdraw our support. But that's the point. The point is that Bank of America disclosed that they routinely bid in auctions, including to prevent auction failures. And therefore, as the courts have said, no reasonable investor could conclude that auctions are not remaining afloat because of broker-dealer support, and Ms. Malachi understood that. And the key fact here, Your Honor, is that on February 6, 2008, Bank of America was not saying auctions are going to fail. It was saying they're going to continue to succeed. And why? Because Bank of America Securities obtained billions of dollars more in balance sheet authority to continue to support auctions. In other words, it was doubling down on its willingness to support auctions. And just the opposite, therefore, of believing that auctions were going to fail. But these e-mails also seem to me you can read these internal documents as saying this is looking grim. We've got to reduce our own exposure and offload the stuff to our account holders and redouble your efforts to move the stuff off our books onto Perini's books. That might be enough, Your Honor, to get past a motion to dismiss, but we're talking about summary judgment. And those e-mails are overridden by Bank of America on February 6th seeking billions of dollars in more balance sheet to continue to buy ARS in order to increase exposure to ARS, to have billions of dollars more in balance sheet. It wasn't until the following day, February 7th, that the unprecedented, the unexpected happened. Goldman Sachs withdrew its support from all SLAR's auctions. There's absolutely no evidence in the record, and Mr. Campanello has not cited any, and he will not cite any when he comes back on rebuttal, saying that Bank of America anticipated that Goldman Sachs would withdraw its support of all auctions. That was unprecedented. And what followed was a domino effect. On February 11th, the following Monday, two major dealers withdrew all their support of SLAR's auctions, and on February 12th, two more major broker-dealers did so, until on February 13th, when Bank of America was the last man standing. Bank of America withdrew its support as well. But this was an unprecedented event that, contrary to what's required under Hill v. Ghazani, there's no evidence that anybody at the bank viewed that as a virtual certainty or even had a hint of a clue that that could potentially happen. It's just the opposite. Even though there were people expressing concerns about the auction market, which you would expect, they were expressing concerns about their balance sheet, Bank of America continued to support every AAA SLAR's auction, and it was doubling down on it on February 6th, just before Goldman Sachs withdrew all of its support for SLAR's auctions. Now, I want to turn back to the Patsos decision, because it's being misinterpreted and misconstrued by Mr. Campanella. What the court said there is that when you have a nondiscretionary account, generally that will not apply a special duty, unless the broker-dealer is making the investment decisions. The exact opposite was happening here. You have a qualified institutional buyer, which the courts in Pivot Point and Anshes v. Merrill Lynch and Louisiana Pacific Gas specifically said is a strong indicator of the investor's sophistication. They were buying hundreds of millions of dollars worth of auction rate securities, and Ms. Melancia, an experienced treasurer, was being supervised by a CFO, a president, and an audit committee. And she made her own decisions to sell all their auction rate securities by the end of December of 2007. Why? Because Perini didn't want to show non-liquid type of investments on its balance sheet. We have a sophisticated public company like Tutu Perini that knew exactly what it was getting into and knew the risks of Bank of America withdrawing in support of auctions. And if you look, Your Honor, at the Associated Randalls Bank case to Judge Easterbrook case in the Seventh Circuit, and it talks about how just because you're making recommendations, that doesn't mean you have an overriding obligation to disclose all details that an investor might find significant because it recognizes that that would be very disruptive of broker-dealers, that that would be incredibly expensive, and that ultimately it would result in less information getting to investors rather than more. And the bottom line is that these duty ordinance, which Perini admits they did not raise below and had every reason to raise below because if you're making an omission argument, well, a predicate to making an omission argument is saying the duty. What's the duty? They didn't make any of these duty arguments below. They're waived. With respect to the January auction failures, just a point of fact, there were 18 failed auctions. There were thousands of successful auctions during that time period, so the number of failed auctions was minuscule. It was indeed rare, as stated in the May 2006 PowerPoint. But of those 18, 14 were things that are completely unrelated to smarts. Eight were the contingent capital ARS trusts that were direct obligations of Radian and Fidget, which were monoline insurers, and that they had been failing since August or September. And six were of American Housing Foundation, which was an issuer that had failed to issue financial statements, and therefore its auctions were failing again since the fall of 2007. Of the other failed auctions, only one was for a AAA-rated slur, and that was in a very small $25 million auction run by a very small regional broker dealer named Stifel Nicholas. And Mr. Kelp, the head of the ARS trading desk at Bank of America, said, we took over that auction immediately thereafter. So there was nothing material, nothing that would alter the mix of information about auctions with respect to these failures that they harp on in January of 2008. And in fact, on February 6th, they were doubling down on their commitment to support slurred auctions. And indeed, there was a court held in Hill v. Ghazani that even when some of the risk materializes, in that case, the risk was that health insurers would not reimburse for the type of procedure that was at issue. And the company disclosed that there was a risk that the health insurers would not reimburse. In that case, the allegation was that some of the insurers had stopped reimbursing. And the court said that even when some of the risk starts to materialize, that doesn't give rise to additional disclosure obligations when you have complied with your duty to disclose. I see my time is up. Thank you, Your Honor. Your Honors, Mr. Rosenberg gets up here and argues facts. Frankly, respectfully, we should be able to present those facts to the jury. He says, for example, oh, there are only 14 failures and only four related to slurs, or only one or two related to slurs. That's interesting because what I would tell the jury is they were very significant to Bank of America because their internal email is talking about, oh, my God, Lehman just failed these three auctions. Why did that happen? We need to find out because it was very important to them. Stifel fails a triple-A student loan auction rate security. They know that internally. Loss and regret doesn't tell sumo watching. He also says that Bank of America did not anticipate the failure. Oh, really? Because I would tell the jury that Bank of America was expecting a failure because Bank of America is tracking the inventory at Goldman Sachs, at J.P. Morgan, at Morgan Stanley, at Merrill Lynch. He made the point that in February they upped their own amount involved in those. Exactly, and when they asked for permission, they told senior management, the president of the company, we have a major structural problem in this market that we need to solve to prevent failure. And they came up with more money is what we're being told. They came up with more money because they were at their limit and they were hoping they were going to weather the storm. They didn't guarantee that next week. No one was saying that they knew that on February 7th, Goldman was going to fail. They knew there was a very high risk of failure. They knew all the banks were at their limits, and they finally decided we're going to go to the president and we're going to ask to extend our limit because we're out of limit. We're out of inventory. We're out of room. We're holding way too much money. Right, and if they hadn't got that, then maybe you're next to the Grand Canyon. But when they put in that much more money, aren't you kind of like in Flagstaff? No, you're at the Grand Canyon because as they concede, when other banks started to fail, not Bank of America first, but when other banks started to fail, this market was non-viable. That's a quote from Merrill Lynch, their deponent. They knew that once Goldman Sachs and J.P. Morgan failed this market, the game was over, and they anticipated it because they're constantly tracking the inventory at those places, and they know we're in world free fall. Passos clearly says you make recommendations, you have a duty to disclose, and it says exactly the opposite of what he said. Even if it's a non-discretionary account, you look at other factors, such as a long-term relationship, what representations were made about giving advice, did you make recommendations, all those factors play in our support, it should go on to the jury, and the jury should have decided whether they had a duty. Finally, he says ignore the PowerPoint. Okay, let's ignore the PowerPoint. The fact is Lois McGrath was the one that said these are better than your conservative investments. Lois McGrath said auction rate securities are good. Lois McGrath said these are great conservative investments. Forget the PowerPoint, although that's clearly the case, and we presented that. Lois McGrath made these representations, she induced the guy to agree to invest in this market when she knew it was in danger, and then in January, when it's on the verge of collapse, she says nothing. Thank you. Thank you.